IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
SOUTHERN DIVISION

| | | |
|---|---|---|
| AMYLEA CARTER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 6:19-CV-03429-WJE-SSA |
| | ) | |
| ANDREW M. SAUL, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

**ORDER**

Plaintiff Amylea Carter seeks judicial review[1] of a final administrative decision of the Commissioner of Social Security ("Commissioner") denying her claim for disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401–434, and supplemental security income under Title XVI of the SSA, 42 U.S.C. §§ 1382–1385. For the reasons that follow, the Court reverses and remands the decision of the Commissioner for further consideration and development of the record.

**I. Background**

Ms. Carter filed a claim for Disability Insurance Benefits on January 18, 2017, and Supplemental Security Income on February 3, 2017. (AR 199-216). She alleged a disability onset date of August 12, 2016, due to fibromyalgia, inflammatory bowel disease, gastroesophageal reflux disease, and acid reflux. (AR 203). The Commissioner initially denied Ms. Carter's claim on March 6, 2017. (AR 140). On April 4, 2017, Ms. Carter requested a hearing for social security benefits before an Administrative Law Judge ("ALJ"). (AR 147). Ms. Carter's hearing was held

---

[1] With the consent of the parties, this case was assigned to the United States Magistrate Judge pursuant to the provisions of 28 U.S.C. § 636(c).

on November 14, 2018, at which time the ALJ determined that Ms. Carter had fibromyalgia, as well as "non-severe seizure disorder, irritable bowel syndrome (IBS), acid reflux, and degenerative joint disease in the hips." (AR 64, 66, 67). On January 9, 2019, the ALJ denied Ms. Carter's claim in a written decision. (AR 64-74).

On February 21, 2019, Ms. Carter filed a Request for Review by the Appeals Council. (AR 5-9). On June 17, 2019, counsel for Ms. Carter submitted additional medical records to the Appeals Council for consideration that had not been before the ALJ.[2] (AR 8). The additional records contained progress notes from a series of appointments with Ronald Glas, M.D., at Mercy Clinic Lebanon, from April 12, 2017 to March 7, 2019. (AR 11-60).

On October 10, 2019, the Appeals Council denied review. (AR 1-5). The Appeals Council declined to exhibit the newly submitted evidence, finding that one of the Mercy Clinic records, a report from March 6-7, 2019, did not relate to the period at issue (August 12, 2016 to January 9, 2019) and the remaining records "[did] not show a reasonable probability that [they] would change the outcome of the [ALJ's] decision." (AR 2). Because the Appeals Council denied review, the ALJ's decision stands as the final decision of the Commissioner. Since Ms. Carter has exhausted all administrative remedies, judicial review is now appropriate under 42 U.S.C. §§ 405(g) and 1383(c)(3).

## II. Disability Determination and the Burden of Proof

The burden of establishing a disability as defined by the Social Security Act in 42 U.S.C. § 423(d) rests on the claimant. *Simmons v. Massanari*, 264 F.3d 751, 754 (8th Cir. 2001); *Roth v.*

---

[2] Counsel for Ms. Carter explained in correspondence that records from both Mercy Hospital and Mercy Clinic Lebanon were requested on October 3, 2018. (AR 8). When Mercy Hospital turned over records on October 30, 2018, counsel "mistakenly thought the records received from Mercy Hospital included the records from Dr. Glas of the affiliated Mercy Clinic." *Id.* Ms. Carter alerted counsel to the oversight on February 28, 2019, when she realized the ALJ's decision and list of exhibits did not include the Mercy Clinic records. *Id.*

*Shalala*, 45 F.3d 279, 282 (8th Cir. 1995). The Social Security Administration has established a five-step, sequential evaluation process for appraising whether a claimant is disabled and benefit-eligible. 20 C.F.R §§ 404.1520, 416.920; *see also Kirby v. Astrue*, 500 F.3d 705, 707 (8th Cir. 2007).

> The Commissioner must evaluate:
> (1) whether the claimant is presently engaged in a substantial gainful activity;
> (2) whether the claimant has a severe impairment that significantly limits the claimant's physical or mental ability to perform basic work activities;
> (3) whether the claimant has an impairment that meets or equals a presumptively disabling impairment listed in the regulations;
> (4) whether the claimant has the residual functional capacity to perform his or her past relevant work; and
> (5) if the claimant cannot perform the past work, the burden shifts to the Commissioner to prove that there are other jobs in the national economy that the claimant can perform.

*Dixon v. Barnhart*, 353 F.3d 602, 605 (8th Cir. 2003); *Simmons*, 264 F.3d at 754–55. The claimant is determined to be disabled if their impairment or combination of impairments "is of a severity to meet or medically equal the criterial of an impairment listed in [the Social Security regulations] and meets the duration requirement" at Step 3, or the claimant "is not able to do other work and meets the duration requirement" at Step 5. (AR 65-66).

### III. Standard of Review

The Eighth Circuit requires the reviewing court to "determine whether the Commissioner's findings are supported by substantial evidence on the record as a whole." *Baker v. Barnhart*, 457 F.3d 882, 892 (8th Cir. 2006) (citation omitted). "Substantial evidence" is less than "a preponderance of the evidence," merely requiring that a reasonable person would find the evidence adequate to support the Commissioner's decision. *Id.* (citation omitted); *Cox v. Barnhart*, 345 F.3d 606, 608 (8th Cir. 2003). The reviewing Court considers all of the evidence on the record but "does not re-weigh the evidence." *Vester v. Barnhart*, 416 F.3d 886, 889 (8th Cir. 2005). Therefore, "even if inconsistent conclusions may be drawn from the evidence, the decision will be

upheld if it is supported by substantial evidence on the record as a whole." *Guilliams v. Barnhart*, 393 F.3d 798, 801 (8th Cir. 2005). In considering the evidence on the record, the Court must consider both evidence that supports and evidence that detracts from the Commissioner's decision. *Karlix v. Barnhart*, 457 F.3d 742, 746 (8th Cir. 2006).

The Court's review proceeds in two stages when a claimant submits additional evidence to the Appeals Council that was not before the ALJ. First, the Court must determine whether the Appeals Council complied with the procedural requirements of the Code of Federal Regulations. *Williams v. Sullivan*, 905 F.2d 214, 216 (8th Cir. 1990) (citing 20 C.F.R. § 404.970). If the Court finds that the Appeals Council observed proper procedures, then the Court next determines whether the Commissioner's decision is supported by substantial evidence on the record as a whole, including both the evidence before the ALJ and the additional evidence that was not before the ALJ. *Browning v. Sullivan*, 958 F.2d 817, 822-23 (8th Cir. 1992) (first determining that the Appeals Council properly considered additional evidence, then proceeding to evaluate whether, in light of the additional evidence, the ALJ's decision was supported by substantial evidence on the record as a whole). The Eighth Circuit has summarized the particularities and peculiarity of the Court's review process as follows:

> Once it is clear that the Appeals Council has considered newly submitted evidence, we do not evaluate the Appeals Council's decision to deny review. Instead, our role is limited to deciding whether the administrative law judge's determination is supported by substantial evidence on the record as a whole, including the new evidence submitted after the determination was made. Of necessity, that means that we must speculate to some extent on how the administrative law judge would have weighed the newly submitted reports if they had been available for the original hearing. We consider this to be a peculiar task for a reviewing court.

*Riley v. Shalala*, 18 F.3d 619, 622 (8th Cir. 1994) (citing *Nelson v. Sullivan*, 966 F.2d 363, 366 (8th Cir. 1992); *Browning*, 958 F.2d at 822). In essence, the Court is tasked with determining whether the outcome would have been different if the ALJ had the opportunity to consider the

entire record.

## IV. Discussion

Ms. Carter raises two issues in her appeal before this Court. First, that the ALJ "erred in failing to find [her] mental impairments severe and failing to include any limitations related to [her] mental impairments" in the residual functional capacity ("RFC") assessment, and second, that the ALJ's fibromyalgia evaluation in the context of the physical RFC determination was improper. (Doc. 16 at 14, 23). Because Ms. Carter submitted new evidence to the Appeals Council after the ALJ issued his decision, the Court must establish whether the Appeals Council complied with regulatory procedural requirements before proceeding to the substantive claims. The Court finds that the Appeals Council complied with regulatory procedural requirements, remand is necessary for further development of the records as to Ms. Carter's seizure-like activity, and the ALJ's fibromyalgia evaluation was proper.

A. *The Appeals Council complied with regulatory procedural requirements*

The Appeals Council must review a case when the claimant (a) submits additional evidence that is "new, material, and relates to the period on or before the date of the hearing decision, and there is a reasonable probability that the additional evidence would change the outcome of the decision," and (b) shows "good cause" for not submitting the evidence earlier. 20 C.F.R. §§ 404.970(a)(5), (b). If "the Appeals Council considers the new evidence but declines to review the case," the Court does not review the Appeals Council denial but proceeds to review the ALJ decision. *Nelson*, 966 F.2d at 366. The Appeals Council need do no more than assert a proper basis for denial of review under 20 C.F.R. § 404.970 to demonstrate that it has considered the new evidence. *Browning*, 958 F.2d at 822 (finding that the Appeals Council considered new evidence

when it "stated that it had considered [the claimant's] newly submitted evidence, but had concluded that it 'does not warrant a change in the Administrative Law Judge's decision'").

The Appeals Council in this instance denied review of the bulk of the Mercy Clinic records on the basis that "this evidence does not show a reasonable probability that it would change the outcome of the decision" and denied review of a record dated March 6-7, 2019 on the basis that "[t]his additional evidence does not relate back to the period at issue." (AR 2). Those are proper bases of denial under 20 C.F.R. § 404.970(a)(5). Therefore, the Appeals Council demonstrated that it had considered the records in accordance with regulatory procedural requirements, and the Court must proceed to consider Ms. Carter's substantive claims.

B. *Remand is necessary because, in light of the Mercy Clinic records, the ALJ would have had to further develop the record before making a determination as to Ms. Carter's seizure-like activity*

Ms. Carter's first claim is that the ALJ's finding of only non-severe mental impairments is not supported by substantial evidence on the record as a whole because the Mercy Clinic records reveal far more mental impairment than the records that were before the ALJ. (Doc. 16 at 21). Ms. Carter maintains that her mental impairment "likely" caused seizure-like activity documented differently and more extensively in the Mercy Clinic records than in the records before the ALJ. (Doc. 16 at 24). Since the Mercy Clinic records were not before the ALJ, the Court must perform the "peculiar task of "speculat[ing] to some extent on how the administrative law judge would have weighed the newly submitted reports if they had been available for the original hearing." *Riley v. Shalala*, 18 F.3d at 622. The Court remands the case for further consideration and development of the record because the ALJ would have weighed the evidence so differently at Steps 2-5 of the sequential evaluation process if he had the Mercy Clinic records at the time of the hearing, that his determination is not supported by substantial evidence on the record as a whole.

### 1. The content of the Mercy Clinic records

The ALJ had evidence of three episodes of seizure-like activity: one on October 8, 2017, and the other two in December 2017 and April 2018 respectively. (AR 425-66, 386-92). The records before the ALJ of the October 8, 2017 episode reflect that she went to the emergency room, she was speaking during the episode, she had an "unremarkable" CT scan, and her doctors could not determine whether the episode was a matter of "possible new-onset seizures vs med-induced vs pseudo-seizures vs psychosomatic causes." (AR 425, 433, 441, 445). The only other record before the ALJ regarding Ms. Carter's seizure-like activity was a set of appointment notes recorded by Papaiah Sreepada, M.D. on May 8, 2018, characterizing all three episodes, from October 2017 to April 2018, as nonepilectic. (AR 391). Dr. Sreepada attributed the first episode to a tramadol overdose and wrote that the second two were "non-epileptic" and possibly caused by depression and anxiety (AR 387).

The Mercy Clinic records document nine additional episodes of seizure-like activity. On October 25, 2017, Ms. Carter reported to Dr. Glas that she experienced seizure-like activity three days earlier. (AR 16-17). On April 2, 2018, Ms. Carter reported an "unusual spell" on January 7, 2018, with fatigue and confusion that led her to fall and injure her face. (AR 22). On June 26, 2018, Ms. Carter reported that she had two seizure-like episodes the prior week, in quick succession, on the same day, with fairly long postictal syndrome. (AR 27). Dr. Glas prescribed Keppra, an antiseizure medication. *Id.* On August 1, 2018, Ms. Carter reported seizure-like activity on July 21, 22, and 27. (AR 29). On that last date, July 27, Ms. Carter alleged that she had four episodes before going to the emergency room. *Id.* She still had a healing abrasion on her face from one of the episodes at the time of her appointment. *Id.* Dr. Glas noted that Ms. Carter "has demonstrated urinary incontinence with seizure." *Id.* Dr. Glas increased her Keppra dosage. *Id.*

On September 26, 2018, Ms. Carter told Dr. Glas that she had experienced no seizure-like activity since increasing Keppra. (AR 31). On December 4, 2018, however, Dr. Glas wrote that Ms. Carter "was seen in the emergency department [the week before] after collapsing on the stairs apparently near the top of the stairs then sliding down." (AR 33). He noted "some pretty significant bruises on the right hip." *Id*. On December 26, 2018, Ms. Carter saw Dr. Glas for a follow-up after visiting the emergency room the week prior for another episode. (AR 36). Dr. Glas noted that Ms. Carter was being weaned from Keppra to prepare for an inpatient EEG study. *Id.* Ms. Carter underwent the study in January 2019, but the results were inconclusive, as she did not experience any seizure-like activity while being monitored. (AR 39).

    2. *Legal standards concerning the evaluation of seizure-like activity*

At Step 2 of the five-step sequential evaluation process, the ALJ is required to assess the severity of the claimant's physical and mental impairments. 20 C.F.R. §§ 404.1520(c), 416.920(c). At Step 3, the ALJ must then determine whether the claimant's impairment or combination of impairments meets or medically equals a Listing. *Id.* For mental impairments, the ALJ must refer to the Listings at both Step 2 and Step 3, because they lay out the standards for the Step 2 mental functioning evaluation. 20 C.F.R. §§ 404.1520a, 416.920a. If the ALJ does not have sufficient information to make those determinations at the time of review, he has a responsibility to further develop the record. *Snead v. Barnhart*, 360 F.3d 834, 838 (8th Cir. 2004) ("[The ALJ] bears a responsibility to develop the record fairly and fully, independent of the claimant's burden to press his case.").

The Social Security Administration evaluates epileptic seizures under neurological criteria and non-epileptic seizures under mental disorder criteria. 20 C.F.R. § 404, Subpt. P, App. 1 ("Listing") 11.00(H)(1). The regulations specify that the two "most common potentially

disabling" types of epileptic seizure are generalized tonic-clonic seizures and dyscognitive seizures. *Id.* Generalized tonic-clonic seizures are characterized by loss of consciousness accompanied by sudden muscle tensing and loss of postural control, followed by convulsions, and they often entail tongue biting, incontinence, and injuries that result from falling. *Id.* Dyscognitive seizures are characterized by "alteration of consciousness without convulsions or loss of muscle control" and often entail "blank staring, change of facial expression, and automatisms (such as lip smacking, chewing or swallowing, or repetitive simple actions, such as gestures or verbal utterances)." *Id.*

The regulations classify "psychogenic nonepileptic seizures and pseudoseizures" as "somatic symptom and related disorders" without delving into the symptomology. Listing 12.00(B)(6). A claimant meets the Listing for "somatic symptom and related disorders" if they have medical documentation of "[s]ymptoms of altered voluntary motor or sensory function that are not better explained by another medical or mental disorder"[3] and "[e]xtreme limitation of one, or marked limitation of two" of four areas of mental functioning: (1) "Understand, remember or apply information," (2) "Interact with others," (3) "Concentrate, persist, or maintain pace," and (4) "Adapt or manage oneself." Listing 12.07.

> 3. *The ALJ would have weighed the evidence differently at Steps 2-5 of the sequential evaluation process if the complete record was before him*

The Mercy Clinic records place the Court in a difficult position. Ms. Carter's mental impairment claim presumes that the seizure-like activity she experienced during her alleged period of disability was "intertwined" with her "mental health problems." (Doc. 16 at 26). The ALJ

---

[3] The claimant may also satisfy the medical documentation requirement under Listing 12.07 by presenting evidence of other symptomologies that are not relevant to Ms. Carter's case.

himself made that presumption, based on the evidence on the record at the time of the hearing. The Mercy Clinic records, however, cast doubt on the etiology of the seizure-like activity.

At Step 2 of the sequential evaluation process, the ALJ evaluated the seizure-like activity under the regulatory standards for evaluating mental disorders. (AR 67). This approach was supported by the evidence before the ALJ, as the Social Security Administration mandates evaluation of "psychogenic nonepileptic seizures and pseudoseizures" under the "mental disorders body system." Listings 11.00(H), 12.07. Based on the record available at the time of the hearing, the ALJ had good reason to presume that Ms. Carter's seizure-like activity was psychogenic or pseudoseizures. The ALJ's decision to evaluate the seizure-like activity under the regulatory standards for evaluating mental disorders was, therefore, supported by substantial evidence on the record *at the time of the hearing*.

The ALJ would have proceeded differently at Step 2 if the Mercy Clinic records had been available at the time of the hearing because they cast significant doubt on whether the seizure-like activity was psychogenic and expand the number of episodes on the record by a factor of four. The record before the ALJ documented only three episodes of seizure-like activity over a period of six months, with the only evidence of etiology being a normal CT scan, evidence of consciousness during the first episode, two doctors' uncertainty about the origin of the episodes, and intimations that each episode was caused either by medication or anxiety and depression. (AR 386-92, 425-66). The record as a whole, including the Mercy Clinic records, documents twelve instances of seizure-like activity over a period of fourteen months, plus evaluation and treatment for epileptic seizures. (AR 20-21, 22, 27, 29, 33-36, 386-92, 425-66). Additionally, the Mercy Clinic records reflect symptomology consistent with epileptic seizures that was not noted in the records before the ALJ, namely, falls causing injury and incontinence. (AR 22, 29, 33).

The ALJ's decision to evaluate the seizure-like activity under mental health criteria at Step 2 of the sequential evaluation process had a cascading effect on the remaining steps.

At Step 3, the ALJ did not evaluate whether Ms. Carter's seizure-like activity met a Listing, because he determined her "possible seizure disorder" to be mental health-related and non-severe under mental impairment criteria at Step 2. (AR 67).

At Step 4, in crafting Ms. Carter's RFC, the ALJ gave "significant weight" to the opinion of State agency medical consultant, John Duff, M.D., which was rendered in March 2017, before the onset of Ms. Carter's seizure-like activity. (AR 71-72). Additionally, the ALJ noted at Step 4 that Ms. Carter "has generally not required aggressive care or frequent hospitalizations" and that "she has reported significant improvement in her symptoms with conservative measures." (AR 71).[4] Those statements are inconsistent with the intensity of care and number of visits to the emergency room reflected in the Mercy Clinic records.

At Step 5, the ALJ determined that, based on the vocational expert's testimony at Ms. Carter's hearing, Ms. Carter could still perform the work of marker. (AR 73). The vocational expert testified, though, that if a "hypothetical person [were] to be absent one to two days a month, month in, month out," that would be "work preclusive" because most "employers of unskilled work" expect no more than eight days off per year. (AR 113-14). The record as a whole memorializes two episodes in October 2017, one episode in November 2017, one episode in January 2018, two episodes in April 2018, one episode in June 2018, three episodes in July 2018, one episode in November 2018, and one episode in December 2018, for a total of twelve episodes over a fourteen-month period. (AR 425, 16, 20, 22, 27, 29, 33, 386). According to the vocational

---

[4] Although the RFC focuses primarily on Ms. Carter's fibromyalgia symptoms, this part of the RFC is broader, explaining that Ms. Carter "has not received the type of treatment indicative of disabling *conditions*," in the plural. (AR 71) (emphasis added).

expert's testimony, if Ms. Carter could not work the day of an episode—and the evidence on the record as a whole indicates she cannot[5]—there would be no jobs available in the national economy for her because she would be off work more than eight days per year.

The Mercy Clinic records would have required the ALJ to further develop the record in order to make a threshold determination as to whether Ms. Carter's episodes were psychogenic or neurological before performing the Step 2 analysis. The record as a whole presents conflicting theories and opinions about the etiology of the seizure-like activity, and the State agency review physician and psychologist rendered their opinions on March 2, 2017, seven months before Ms. Carter's first episode and more than twenty months before the hearing. (AR 64, 121, 129). Without further developing the record, the ALJ could not make the threshold determination at Step 2 and, therefore, could not proceed to Steps 3-5. Although the Court is tasked with the "peculiar" task of speculating as to how the ALJ would have decided with the entire record before him, the Court is not equipped to make a medical determination about the origin of Ms. Carter's seizure-like activity. That is a determination for the ALJ to make based on the entirety of the record, and whatever evidence he solicits to further develop the record.

C. *The ALJ's fibromyalgia evaluation was proper.*

Ms. Carter claims that the ALJ improperly evaluated the evidence of Ms. Carter's fibromyalgia, resulting in a physical residual functional capacity assessment unsupported by substantial evidence on the record as a whole. (Doc. 16 at 14). The Court finds that the ALJ properly assessed the evidence concerning fibromyalgia, such that the physical RFC was supported by substantial evidence on the record as a whole.

---

[5] The record includes evidence of emergency room visits, urinary incontinence, falls causing substantial bruising, incoherent speech, somnolence, and long postictal periods due to the seizure-like activity. (AR 22, 27, 29, 33, 36, 428).

To account for Ms. Carter's fibromyalgia symptoms and potential medication side effects, the ALJ crafted an RFC that limited Ms. Carter to "light exertional work," barred her from climbing "ladders, ropes, or scaffolds, or at unprotected heights," and required "only frequent[] balance." (AR 71). The ALJ reached this conclusion by weighing the medical evidence, nonmedical evidence, and Ms. Carter's subjective reports, determining that the subjective reports of disabling pain were inconsistent with other evidence on the record. (AR 70-71). The ALJ weighed Ms. Carter's reports of "widespread and chronic musculoskeletal pain," usage of pain medication, and "tenderness to palpitation [sic] over the spine and various joints" against her "largely… conservative" treatment, report of improvement in her symptoms "with conservative measures," physical exams showing "normal strength, sensation, reflexes, and range of motion of the spine and joints," "normal gait and… coordination and balance," and lack of "joint swelling, deformity, or erythema." (AR 70-71). Additionally, the ALJ noted that Ms. Carter reported performing a "variety of activities," including cleaning, paying bills, minimal household repairs, personal care, regular light exercise, crafts, shopping, and fishing. (AR 71). Albeit that there are some qualifications on how Ms. Carter performs these activities (for example, she reported that she did not use weights over two pounds for exercise), the range and nature of her physical activities further support the ALJ's determination that she can perform light work. (AR 71, 102).

The Court finds, for the foregoing reasons, that the ALJ's RFC was supported by substantial evidence on the record as a whole. Ms. Carter's argument that "[o]bjective findings and hospitalizations tell us little to nothing about the severity of fibromyalgia" is unavailing. (Doc. 16 at 18). The ALJ is required to base his decision on the consistency of a claimant's subjective reports with "objective medical evidence from an acceptable medical source." 20 C.F.R. §§ 404.1529(a), 416.929(a). If the ALJ's determination is supported by substantial evidence on the

record as a whole, the Court may not reverse simply because there is compelling subjective testimony or because some objective evidence is consistent with the claimant's subjective reports. *Gilliams*, 383 F.3d at 801 ("[E]ven if inconsistent conclusions may be drawn from the evidence, the decision will be upheld if it is supported by substantial evidence on the record as a whole.").

Finally, the Court finds that the Mercy Clinic records do not undermine the ALJ's fibromyalgia determination.[6] The most recent fibromyalgia evidence considered by the ALJ was filed on March 2, 2017 and the Mercy Clinic records begin on June 12, 2017. (10, AR 121, 129). Thus, there is no chronological overlap between the Mercy Clinic records and the other records regarding fibromyalgia, as there was with the seizure-like activity. The Mercy Clinic records are cumulative of the record that was before the ALJ, reflecting the same symptoms, medication management, and frequency of appointments.

D. *The ALJ must further develop the record*

Remand is necessary for consideration and development of the entire record. The Court cannot speculate on how the ALJ would have proceeded with the complete record, because the ALJ almost certainly would not have determined whether the seizure-like activity was psychogenic or epileptic without further developing the record. Moreover, no matter the outcome of that determination, Steps 2, 3, 4, and 5 of the ALJ's decision would have been very different if the Mercy Clinic records had been in the record at the time of the hearing. It would be better for the Court to defer on the threshold medical questions raised by the Mercy Clinic records and, instead, remand for further development of the record.

---

[6] Although Ms. Carter did not raise the issue of the Mercy Clinic records in relation to fibromyalgia, the Court is required to review the ALJ's determination in light of the complete record, which includes the Mercy Clinic records.

### III. Conclusion

For the reasons set forth herein, the Court finds the Commissioner's determination that Ms. Carter was not disabled is not supported by substantial evidence on the record as a whole and is therefore reversed and remanded for further consideration and development of the record.[7] Judgment shall be entered in accordance with this Order.

Accordingly,

IT IS, THEREFORE, ORDERED that the decision of the Commissioner is reversed and remanded for further consideration and development of the record, as set forth herein.

Dated this 24th day of March, 2021, at Jefferson City, Missouri.

*Willie J. Epps, Jr.*

Willie J. Epps, Jr.
United States Magistrate Judge

---

[7] If the Commissioner's decision is reversed, the case should ordinarily be remanded for further proceedings "out of our abundant deference to the ALJ." *Buckner v. Apfel*, 213 F.3d 1006, 1011 (8th Cir. 2000) (citation and quotation marks omitted). An immediate finding of disability is warranted only "if the record overwhelmingly supports such a finding." *Id.* (citation and quotation marks omitted).